### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KIMBERLY BUNGER-STANLEY,
       Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
       Defendant

Case No. 1:10-cv-507

Beckwith, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 6), the Commissioner's response in

opposition (Doc. 7), and plaintiff's reply in support. (Doc. 8).

### PROCEDURAL BACKGROUND

Plaintiff was born in 1970. She has a high school education and past relevant work as a

certified nursing assistant. (Tr. 63). Plaintiff filed DIB and SSI applications in May 2005

alleging a disability onset date of June 1, 2004, because of a herniated lumbar disc, anxiety and

depression. (Tr. 50, 62). The applications were denied initially and upon reconsideration.

Plaintiff then requested and was granted a de novo hearing before administrative law judge (ALJ)

Samuel A. Rodner on October 2, 2008. (Tr. 261-287). Plaintiff, who was represented by

counsel, appeared at the hearing. An independent vocational expert (VE), Dr. Janice Bending,

also appeared and testified at the hearing. (Tr. 281-287).

On October 24, 2008, the ALJ issued a decision denying plaintiff's DIB and SSI applications. (Tr. 16-23). The ALJ determined that plaintiff suffers from the following severe impairments: depression, anxiety, and mild disc bulges at L4-5 and L5-S1 with a superimposed central disc protrusion at L5-S1 and mild facet arthropathy. (Tr. 18). The ALJ found that although plaintiff has also been followed by her primary care physician for fibromyalgia and migraine headaches, there is no substantial evidence that these impairments are severe as defined in the Social Security Act (SSA). (*Id.*).

The ALJ found that plaintiff does not have an impairment or combination of impairments that meet or medically equal any in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*). The ALJ specifically determined that plaintiff's impairments do not meet or equal §§ 1.04A, 12.04 or 12.06. (Tr. 19).

The ALJ determined that plaintiff retains the residual functional capacity (RFC) to perform a range of sedentary work as defined in 20 C.F.R. § 416.967(a) and 20 C.F.R. § 404.1567(a). (*Id.*). The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with the RFC assessment. (*Id.*). The ALJ determined that plaintiff is unable to perform any past relevant work. (Tr. 22). However, based on the VE's testimony, and using Medical-Vocational Rule 201.28 as a framework for decision-making, the ALJ determined that there are jobs that exist in significant numbers in the national economy that plaintiff could perform given her RFC. (Tr. 22-23). Consequently, the ALJ concluded that plaintiff is not disabled under the SSA and therefore not entitled to DIB and SSI. (Tr. 23).

The Appeals Council denied plaintiff's request for review, making the decision of the

ALJ the final administrative decision of the Commissioner. (Tr. 6-9).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g). The Court's sole function is to determine whether the record as a whole contains

substantial evidence to support the Commissioner's decision. The Commissioner's findings

stand if they are supported by "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing

*Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the

Commissioner's findings are supported by substantial evidence, the Court must consider the

record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age

65, file an application for such benefits, and be under a disability as defined by the SSA. 42

U.S.C. §§ 416(1), 423. To qualify for SSI, plaintiff must file an application and be an "eligible

individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is

dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202.

Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a

medically determinable physical or mental impairment that can be expected to result in death or

that has lasted or can be expected to last for a continuous period of not less than 12 months. 42

U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the

work previously performed or in any other substantial gainful employment that exists in the

national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations.  20 C.F.R. § 404.1520.  First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends.  Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments.  An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience.  *Farris v. Sec'y of HHS,* 773 F.2d 85, 90 (6th Cir. 1985) (citation omitted).  *See also, Bowen v. Yuckert,* 482 U.S. 137 (1987).  If the individual does not have a severe impairment, then a finding of nondisability is made and the inquiry ends.  Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing, 20 C.F.R. Part 404, Subpart P, Appendix 1.  The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work.  20 C.F.R. § 404.1525(a).  Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits.  It is sufficient if the impairment is medically equivalent to one in the Listing.  20 C.F.R. § 404.1520(d).  To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment.  20 C.F.R. § 404.1526(a).  The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. § 404.1526(b).  If the

impairment meets or equals any within the Listing, the Commissioner renders a finding of disability without consideration of the individual's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981). Fourth, if the individual's impairments do not meet or equal any in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1053 (6th Cir. 1983).

Plaintiff has the burden of proof at the first five steps of the sequential evaluation process. *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999). *See also Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *Wilson*, 378 F.3d at 548. *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson*, 378 F.3d at 548.

5

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three. 20 C.F.R. § 416.920a. At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Rabbers v. Commissioner Social Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) (citing 20 C.F.R. § 404.1520a(b)(1)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R. § 404.1520a(c)(3)). The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.; *Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir. 2008)). The degree of limitation in the first three functional areas is rated using the following five-point scale: None, mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* (citing § 404.1520a(d)(1)). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *Id.* (citing § 404.1520a(d)(2)). At step three of the sequential evaluation, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed

6

mental disorder." *Id.* A claimant whose impairment meets the requirements of the Listing will be deemed conclusively disabled. *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)).

**MEDICAL EVIDENCE**

### A. Dr. Nancy Slattery, M.D.

Dr. Nancy Slattery, M.D., an internist, treated plaintiff from July 2001 through June 2008. (Tr. 201-234, 236-245). As of July 20, 2001, plaintiff was on medication for depression, anxiety and migraines. (Tr. 218). Plaintiff reported she had stopped taking Zoloft because it caused nightmares. Valium helped but plaintiff's mood was quite low. On October 21, 2002, plaintiff complained of the sudden onset of lower back pain radiating into her shoulder and neck which had occurred when she lifted a vacuum cleaner. (Tr. 216-217). Dr. Slattery diagnosed a lumbar strain. Plaintiff's medications included Valium for anxiety, which provided no significant help. Dr. Slattery added Vioxx, Vicodin and Flexeril to her medications.

On January 14, 2004, plaintiff complained of lower back pain radiating down the left leg resulting from an injury she had sustained when lifting a box of clothes. (Tr. 214). Dr. Slattery noted positive straight leg raising, decreased strength on the left, and pain with flexion and extension of the back. Dr. Slattery diagnosed plaintiff with sciatica and a herniated disc.

On June 25, 2004, plaintiff reported to Dr. Slattery that she had woken up in the morning with lower back pain and cramping after working in the yard the prior evening for several hours raking and picking up debris. (Tr. 213). Plaintiff complained that it hurt to twist and bend, but

7

she denied that the pain was radiating down her leg. Dr. Slattery noted on physical examination that plaintiff had a tender paralumbar spine, negative straight leg raising, and pain on flexion, extension and lateral bending. Dr. Slattery diagnosed a lumbar strain and prescribed Flexeril and Vicodin.

An MRI of the lumbar spine on July 10, 2004, showed mild disc bulges at L4-5 and L5-S1 with central disc protrusion at L5-S1 but without significant thecal sac or nerve root encroachment, and mild hypertrophic facet arthropathy at L4-5. (Tr. 225-226).

In July 2004, plaintiff complained of continued back pain with numbness in the legs as well as difficulty bending her legs as it caused shooting pains. (Tr. 212). Plaintiff had reduced range of motion of the back and a positive straight leg raising test. Her medications included Vicodin, Flexeril, and Lidoderm patches. Plaintiff complained that pain medication, physical therapy, and epidural steroid injections (ESIs) had provided minimal relief. (Tr. 227). Plaintiff also complained of depression and anxiety, for which she was prescribed Celexa. (Tr. 227).

On September 27, 2004, plaintiff presented with continuing lower back pain down the right leg. (TR. 211). She reported that physical therapy was not helping and Vicodin was not providing as much relief. She was using Ibuprofen twice a day. Dr. Slattery noted that plaintiff's back was tender to palpation, she had positive straight leg raising on the right, and she had mild weakness of the right lower extremity. Dr. Slattery prescribed a Medrol dose pack, Percocet, and Toradol for the herniated disc.

On March 4, 2005, plaintiff reported continued lower back pain that radiated to her leg. (Tr. 210). She had seen Dr. Hughes, a neurologist to whom Dr. Slattery referred plaintiff, but had declined the treatment options he had suggested. Plaintiff reported muscle relaxers made her

nauseous. She reported antidepressants helped. Dr. Slattery's findings were tender lower lumber and positive straight leg raising. Plaintiff was continued on Percocet and ESI. Plaintiff had a total of four ESIs at Deaconess Hospital between March and June 2005. (Tr. 138-154).

On August 8, 2005, plaintiff came to Dr. Slattery's office for a refill of Celexa and reported that she was tolerating the medication better after initially experiencing side effects of diarrhea and abdominal pain. (Tr. 209). She was not crying as much and was focusing better. Her migraines were stable and her anxiety was controlled by Valium. She was continued on Celexa for depression and Percocet and was to restart physical therapy at some point for bulging discs.

Dr. Slattery completed a lumbar RFC assessment on December 12, 2005. (Tr. 160-166). She listed plaintiff's diagnoses as herniated discs at L4-5 and L5-S1, FMS [fibromyalgia syndrome], migraines and anxiety. (Tr. 161). She described plaintiff's prognosis as fair. Dr. Slattery identified plaintiff's symptoms as pain in the lower back and shooting down the left leg, fatigue rated as 8/10, insomnia when the pain was severe, and concentration at baseline. The pain was described as a throbbing pain that was 9/10 level of severity and precipitated by sweeping, mopping, vacuuming, bending and lifting. The positive objective signs were decreased flexion at the waist and positive straight leg raising on the left at 20 degrees. Dr. Slattery opined that plaintiff's pain and other symptoms were severe enough to interfere with the attention and concentration to perform even simple work tasks "occasionally," meaning 6% to 33% of an 8-hour workday. Dr. Slattery noted that plaintiff denied the side effects of any medication that may have implications for working, such as dizziness, drowsiness and stomach upset. Dr. Slattery estimated that plaintiff could walk 1 block without rest or severe pain; she

9

could sit for 15 minutes before needing to get up; she could stand for 30 minutes at a time; she could sit and stand/walk about 4 hours intermittently in an 8-hour workday; she must walk every 15 minutes in an 8-hour workday for 5 minutes each time; she must be permitted to shift positions from sitting, standing and walking at will; she would need to take unscheduled hourly breaks during an 8-hour workday and rest for 10 minutes before returning to work; she does not require an assistive device; and she can occasionally lift and carry less than 10 pounds, she can rarely lift and carry 10 pounds, and she can never lift or carry 20 pounds. She can never twist, stoop or climb ladders and can rarely crouch/squat and climb ladders. She is likely to miss work more than 4 days a month. Dr. Slattery listed the onset date of these symptoms and limitations as January 14, 2004.

On June 12, 2006, Dr. Slattery diagnosed plaintiff with FMS and depression, which were doing well with Celexa, and chronic back pain. Dr. Slattery questioned whether plaintiff should see a pain specialist. (Tr. 207).

On July 7, 2006, plaintiff's medications included Lexapro and Percocet. (Tr. 206). Plaintiff was out of Celexa and her FMS and anxiety were not doing well as a result.

Dr. Slattery completed another medical questionnaire dated July 18, 2006. (Tr. 169-171). She described the nature and symptoms of plaintiff's medical condition as "bulging disks [sic] L4-5, L5-S1 and facet arthropathy." (Tr. 170). Dr. Slattery listed the onset date as October 2002 and indicated that the condition worsened in January and July 2004, May 2005 and July 2006. She listed the pertinent findings on clinical examination as decreased range of motion in the back, "tender to palpation," decreased sensation in both feet, and a negative straight leg raising test. (*Id.*). For the description of any surgical or clinical intervention required for treatment or

10

any future plan of treatment, Dr. Slattery wrote, "pt declines surgery" and "pt declines ESI." (*Id.*). When asked to describe plaintiff's medications, their effectiveness, and plaintiff's compliance, Dr. Slattery simply listed four medications and the dosage - Valium, Celexa, Percocet, and Soma. For the prescribed therapy and plaintiff's response, Dr. Slattery noted that plaintiff "went to pt - found it to be of no benefit." (Tr. 171). In describing the limitations on plaintiff's ability to perform sustained work activity, Dr. Slattery wrote that plaintiff "cannot sit, stand or walk prolonged," she "cannot stoop or lift," and she had "worsening depression." (*Id.*).

Dr. Slattery completed a "Basic Medical" form in July 2006. (Tr. 229-230). Dr. Slattery noted she had last examined plaintiff on July 11, 2006. Dr. Slattery's only neurological finding was weakness of the right foot. Her other findings included straight leg raising on the right and decreased range of motion of the spine. Dr. Slattery listed plaintiff's medical conditions as herniated discs, FMS, depression with anxiety and migraines. She described plaintiff's conditions as follows: Plaintiff's herniated discs, which were treated with ESI, pain medications, and "physical RX", were "poor but stable"; her FMS, which was treated with antidepressants, muscle relaxers, and pain medicine, was likewise "poor but stable"; and plaintiff's depression with anxiety, which was treated with medication, was "good/stable." (Tr. 229). Dr. Slattery indicated that plaintiff had poor sleep and concentration and irritability which intensified with increased pain. She stated that plaintiff had "Back Pain 2 degrees HD - 9/10 " which radiated down the right leg. (*Id.*). Dr. Slattery indicated that plaintiff could stand/walk 2 hours in an 8-hour workday and 10 minutes without interruption; plaintiff could sit 3 hours in an 8-hour workday and 15 minutes without interruption; she could lift/carry up to 6-10 pounds frequently; and pushing/pulling and bending were extremely limited, reaching was markedly limited, and

11

repetitive foot movements were moderately limited.  Dr. Slattery concluded plaintiff was unemployable and the physical limitations listed were expected to last 12 months or more.

On July 11, 2006, Dr. Slattery completed a Department of Job and Family Services form on which she was to indicate the number of hours per day and the number of days per week plaintiff could participate in job training activities or volunteer work for purposes of transitioning from welfare to work.  (Tr. 236).  Dr. Slattery wrote across the form "No."  (*Id.*)

Dr. Slattery completed another "Basic Medical" form in what appears to be August 2007. (Tr. 227-228).  She reported she had last examined plaintiff on August 10, 2007.  The only neurological findings she noted were weakness and decreased sensation of the lower left extremity.  Her findings also included decreased flexion and extension of the spine.  Dr. Slattery described plaintiff's medical conditions as FMS, "HD", Migraines, Anxiety, and "TMJ".  (Tr. 227).  Dr. Slattery noted that ESI, pain medications, and physical therapy had provided minimal relief for plaintiff's herniated discs, but Dr. Slattery checked a box listing plaintiff's overall health status as good/stable with treatment.  (*Id.*).  Dr. Slattery indicated that plaintiff had poor sleep and concentration and irritability which pain intensified.  She indicated that plaintiff had "Back Pain 2 degrees HD - 8/10" which radiated down the left leg.  (*Id.*).  Plaintiff was experiencing migraines twice a month.  Dr. Slattery found the same functional limitations she had found in July 2006.

In February 2008, Dr. Slattery noted that plaintiff's FMS and herniated discs were "doing okay" and plaintiff was willing to try some new medications.  (Tr. 243).  Plaintiff's anxiety was doing well.  Plaintiff's medications included Celexa, Percocet, Soma and Valium.  The plan was to try Lyrica, refill the Percocet, and continue therapy for anxiety.

On June 30, 2008, plaintiff had increasing pain in her back "and now in her rt LE." (Tr. 240). She was using her medications with some relief.

**B. Dr. Arthur Hughes, M.D.**

Dr. Arthur Hughes, M.D., a neurologist, examined plaintiff three times between October 29, 2004 and May 24, 2005. (Tr. 132-135). Following his first examination, Dr. Hughes reported in a letter to Dr. Slattery that plaintiff first had sudden onset of back pain in 1998 when she felt a pop in her lower back while picking up her three year old son. (Tr. 135). She had experienced recurring flare ups of pain brought on by activity and another pop in June of 2004 while doing yardwork. The pain did not resolve and plaintiff experienced some radiating pain and tingling in both legs. Plaintiff was using Percocet and Valium for the pain. Physical therapy had made the pain worse. The MRI from July 2004 showed a prominent central disc protrusion at L5/S1 and a small bulge at L4/5, but there did not appear to be any definite neural compression. Plaintiff was not enthusiastic about epidural injections. On examination, straight leg raising on the right produced lower back pain at 90 degrees and on the left produced less severe lower back pain at 90 degrees. There was a slight alteration in light touch sensation affecting the right foot. Gait was unremarkable and plaintiff could stand on toes and heels. She could forward flex at the waist to 60 degrees, laterally bend to 25 degrees to both sides, and extend to 20 degrees. The paraspinal muscles were not tender. Dr. Hughes' impressions were chronic low back pain with symptoms suggestive of radiculopathy, particularly on the left side, and prominent central disc protrusion at L5/S1. Dr. Hughes noted they discussed various

13

treatment options, including ESI, which plaintiff declined, chiropractic treatments, additional therapy, or a surgical opinion. He reported that plaintiff was not enthusiastic about any of these approaches at that point and wished to continue using Percocet, which Dr. Hughes considered a reasonable option.

Dr. Hughes saw plaintiff again on January 25, 2005, and reported that her condition was unchanged. (Tr. 134). She reported continuing lower back pain radiating predominantly into either the right leg or the left leg and paresthesias of the legs at times. Plaintiff reported that she had difficulty getting her housework completed and she did not feel that she could return to work. On examination, she was sitting on the left buttock and her gait was slow. She could stand on toes and heels, forward flex at the waist to 70 degrees, laterally bend to 20 degrees to both sides, and extend to 15 degrees. Straight leg raising was negative to 90 degrees bilaterally. The recommendation was that plaintiff continue to control her pain with Percocet.

Dr. Hughes examined plaintiff on May 24, 2005. (Tr. 132). He stated in a letter to Dr. Slattery that plaintiff looked depressed. He reported that plaintiff had gone through three epidurals without much success and another one was planned in two weeks. Dr. Hughes stated that plaintiff was not enthusiastic about physical therapy or seeing a chiropractor. Dr. Hughes reported that tendon reflexes were brisk and symmetrical and straight leg raising was negative. His impression was persistent low back pain without evidence of radiculopathy. Dr. Hughes recommended awaiting the results of the fourth epidural and considering physical therapy, which he noted had increased plaintiff's pain the last time she tried it.

### C. State Agency Reviewing Physicians

Dr. James Gahman, a state agency physician, reviewed the file and completed a case

14

analysis on September 5, 2005. (Tr. 173). He summarized the record evidence as showing a central disc protrusion at L5-S1 and a small bulge at L4-5 but no neural compression. Plaintiff's October 29, 2004 examination revealed a normal gait and an ability to stand on heels and toes. Plaintiff had been diagnosed with radiculopathy by her symptoms but not signs. The only documented ongoing intervention was pain medication. The record indicated that she has difficulty climbing stairs and her gait is slow, but she does not require an ambulatory aid. Her limited back motion is due to pain and she has no documented sensory or motor deficit.

Dr. Myung J. Cho, M.D., a state agency physician, reviewed the file and completed a physical RFC assessment on August 9, 2006. (Tr. 193-200). He found that plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit about 6 hours in an 8-hour workday, and stand and/or walk about 6 hours in an 8-hour workday. Plaintiff could occasionally kneel and crawl. The evidence Dr. Cho cited in support of his findings were the July 2004 scan showing the central disc protrusion at L5/S1 and small bulge at L4/5 for which plaintiff had received some lumbar epidural steroid injections, decreased flexion range of motion, tenderness to palpation, and decreased sensation of the feet bilaterally.

### D. Psychological Evaluations

Dr. David Chiappone, Ph.D., a psychological consultant, examined plaintiff on June 24, 2005. (Tr. 155-159). Plaintiff cried throughout the interview. She said she was depressed and anxious. She complained of constant crying spells. Plaintiff came across in the exam as markedly depressed. She did not appear to be malingering. Dr. Chiappone opined that plaintiff is mildly impaired in her ability to remember simple one and two-step job instructions; she is mildly to possibly moderately impaired in her ability to concentrate and attend over time; she is

mildly to moderately impaired in her ability to relate to co-workers, supervisors and the public because of anxiety and depression; she is moderately impaired in her ability to carry out and persist over time due to depression and pain; and she has moderately reduced stress tolerance. Dr. Chiappone opined that plaintiff's GAF[1] score for symptoms would be 48 while her functional level is 58 as she is capable of doing some basic tasks on a limited basis.

Patricia Semmelman, a state agency psychologist, reviewed the file and completed a Psychiatric Review Technique form on October 11, 2005. (Tr. 175-191). The assessment was affirmed as written by Johns S. Waddell, PhD. (Tr. 175). The reviewing psychologist determined that plaintiff has the following degrees of limitation:

-      Restriction of Activities of Daily Living:        Mild
-      Difficulties in Maintaining Social Functioning:        Moderate
-      Difficulties in Maintaining Concentration, Persistence or Pace:        Moderate
-      Episodes of Decompensation, Each of Extended Duration:        None

She opined that plaintiff is moderately limited in two rating categories: "B.6. The ability to maintain attention and concentration for extended periods," and "B.11 The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 190). The reviewing psychologist found that plaintiff is not significantly limited in any other rating category. She provided the following summary conclusion, in relevant part:

The written information from the claimant shows that she is literate with an

_____

A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. *Id.* Individuals with scores of 51-60 are classified as having "moderate" symptoms. *Id.*

average IQ. She can understand and follow multi-step uncomplicated oral and written directions. Memory is intact. Concentration and attention is mild[ly] to moderate[ly] impaired . . . . She told the CE she does some light chores. On her written ADL, she reports she makes home cooked meals and engages in a number of household chores and cares for her four children. She also reads to her children on a daily basis. Her husband helps her with carrying the laundry and shops with her due to her physical complaints. She is able to take the bus and walk. She can sustain concentration and attention for routine tasks. The claimant cried the entire time she was seen by the CE; however, other sources including the DO due [sic] not observe any crying spells. She enjoys playing with her children. They go to the park. She is less comfortable socially, but mostly due to her physical complaints. She had no problems interacting with others in a work setting in the past. Her level of depression and anxiety is mild to moderate in severity at times. She indicated on her written ADL nightmares and anxious [sic] and sweats if stressed, but did not report these symptoms at the Ce. The report from her AP shows only physical complaints and she is receiving Xanax, but is not on any anti-depressant nor has she sought any psychiatric treatment. Her social skills are mild to moderately impaired. She can interact occasionally and superficially and receive instructions and ask questions appropriately in a work setting. She can cope with ordinary and routine changes in a work setting that is not fast paced or of high demand. Allegations are credible. Presentation at the CE was a bit less than credible which affects a bit the conclusions drawn by the Ce.

(Tr. 191).

## Statements of Error

Plaintiff assigns five errors in this case: (1) The ALJ erred by failing to explain, in narrative form, how he arrived at the RFC, which doctors he gave the most weight to, and why he assigned the doctors the weight he did as required under SSR 96-8p; (2) the ALJ erred under 20 C.F.R. § 404.1527(d) and SSR 96-2p by not giving the most weight or controlling weight to the opinion of the treating physician, Dr. Slattery, and instead giving her opinion no weight; (3) the ALJ erred by failing to give "good reasons" for discounting Dr. Slattery's finding of disability; (4) the ALJ erred by rendering a credibility finding that is not supported by the record; and (5) the ALJ erred by posing hypothetical questions to the VE which omitted limitations which were supported by the testimony of both Dr. Slattery and plaintiff and the limitation of "occasional"

17

contact with the public, and by including among the unskilled jobs plaintiff could perform jobs which an updated vocational source, the O*NET, shows are in fact skilled.

## OPINION

### A. First, Second and Third Assignments of Error

Plaintiff presents essentially the same argument in his first three assignments of error. He claims that the ALJ erred by failing to afford the most or controlling weight to the opinion of the treating physician, Dr. Slattery. Because each of these assignments of error addresses the same fundamental issue, the Court will consider the first three assignments of error together.

Plaintiff claims that the ALJ committed erred by failing to accord Dr. Slattery's opinion the most or controlling weight and by relying instead on the findings of the treating neurologist, Dr. Hughes, because Dr. Hughes never saw plaintiff after 2005 and never gave an opinion as to plaintiff's RFC; Dr. Slattery made objective findings which were reliable indicators of disabling pain under 20 C.F.R. § 404.1529(c)(2), including restricted motion, tenderness, positive straight leg raising, and decreased sensation in the legs, and the limitations she found were supported by the MRI; and the ALJ failed to give "good reasons" for rejecting Dr. Slattery's opinion. Plaintiff contends that Dr. Slattery found worsening symptoms and made positive findings well after Dr. Hughes had examined her in 2005, which included low back pain radiating down the legs (Tr. 210-211, 227-228) and decreased sensation down the legs. (Tr. 241-244). Plaintiff alleges that based on the treatment relationship, length of treatment, consistency, and supportability as demonstrated by the objective medical evidence and the examination findings, the ALJ was bound by the Social Security rules and regulations to give the most or controlling weight to Dr. Slattery.

SSR 96-8p provides as follows:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) [] and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor. *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2); *see also Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004); SSR 96-2p. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined

a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(3)-(6); *Wilson*, 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Sec. of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). In order to find plaintiff

20

disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of the pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). In addition to the objective medical evidence, the Commissioner must consider other evidence of pain, such as statements or reports from plaintiff, plaintiff's treating physicians and others about plaintiff's prescribed treatment, daily activities, and efforts to work, as well as statements as to how plaintiff's pain affects her daily activities and ability to work. *Felisky v. Bowen*, 35 F.3d 1027, 1037-38 (6th Cir. 1994) (citing 20 C.F.R. § 404.1529(a)). Specific factors relevant to plaintiff's allegations of pain include her daily activities; the location, duration, frequency and intensity of her pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication plaintiff takes; treatment other than medication plaintiff has received for relief of her pain; any measures plaintiff uses to relieve her pain; and other factors concerning her functional limitations and restrictions due to pain. *Id.*; 20 C.F.R. § 404.1529(a). Although plaintiff is not required to provide "objective evidence of the pain itself" in order to establish that she is disabled, *Duncan,* 801 F.2d. at 853, statements about her pain or other symptoms are not sufficient to prove her disability. 20 C.F.R. § 404.1529(a). The record must include "medical signs and laboratory findings which show that [plaintiff has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion that [plaintiff is] disabled." *Id.*

21

Where the medical evidence is consistent and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, there is both substantially conflicting medical evidence as well as substantial evidence supporting a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

Here, the ALJ fulfilled the requirements of the Social Security rules and regulations, and his decision that plaintiff can perform a range of sedentary work is supported by substantial evidence. The ALJ gave "good reasons" for failing to give the most or controlling weight to Dr. Slattery's opinion, he adequately explained the weight he gave to the medical sources who examined plaintiff and reviewed the file, and he reasonably determined the weight to afford the opinions of those sources.

Initially, the Court finds that in arguing otherwise, plaintiff has misrepresented the record. Plaintiff contends that the ALJ erroneously found Dr. Slattery did not state at what degree a straight leg raising test was positive when Dr. Slattery in fact stated it was positive at 20 degrees. Plaintiff is referring to the portion of the ALJ's decision wherein the ALJ stated that on March 4, 2005, Dr. Slattery found positive straight leg raising but failed to indicate the degree. (Tr. 21, citing Tr. 210). However, a review of the record shows the ALJ is correct: Dr. Slattery did not document the degree at which straight leg raising was positive on that date. (Tr. 210). To show that the ALJ's finding is mistaken, plaintiff cites a form Dr. Slattery completed on a different

22

date, December 12, 2005. (Doc. 6 at 5, citing Tr. 162). The December 12, 2005 examination is

clearly not the examination the ALJ referenced. The ALJ's finding is accurate and supports the

ALJ's decision to discount Dr. Slattery's clinical findings based on her failure to adequately

document them.

Similarly, plaintiff argues that the ALJ erred in not noting Dr. Slattery's later exam

findings from February and June of 2008. (Doc. 6 at 5, citing Tr. 241-244). This also is not an

accurate representation of the record. The ALJ in fact considered Dr. Slattery's later

examinations from February and June of 2008 (Tr. 241-244), and correctly noted that the

physical examinations yielded boiler plate findings which were "exactly the same." (Tr. 21).

The ALJ reasonably determined that Dr. Slattery's assessments were entitled to no weight

because they were not well-supported and were inconsistent with other significant evidence,

including Dr. Hughes' physical examinations and Dr. Slattery's own examinations. (*Id.*). The

ALJ gave "good reasons" for not affording Dr. Slattery's opinion the most or controlling weight.

While the ALJ acknowledged that Dr. Slattery had been plaintiff's primary care physician from

November 20, 1998, to the time of the ALJ's decision, the ALJ also observed that plaintiff was

treated by Dr. Hughes from October 29, 2004 to May 24, 2005, and that the assessments of Dr.

Hughes, a specialist in neurology, were entitled to great weight. (Tr. 20). The ALJ thoroughly

compared Dr. Hughes' findings with those of Dr. Slattery and examined whether Dr. Slattery's

assessments were supported by the medical evidence of record. The ALJ noted that Dr. Slattery

correctly found mild disc bulges in July 2004 and that plaintiff exhibited diminished range of

motion consistent with that finding, but the MRI showed no nerve impingement; although Dr.

Slattery found positive straight leg raising in July 2004, she did not elaborate on that finding,

23

including by noting whether positive meant "reproducing radicular symptoms or signs" or just

producing pain; on March 4, 2005, Dr. Slattery failed to say at what degree she found positive

straight leg raising or whether any radicular signs or symptoms were reproduced; and unlike Dr.

Slattery, Dr. Hughes never made a finding of a positive straight leg raising test. (Tr. 20-21). The

ALJ also totally discounted Dr. Slattery's finding of mild weakness of the right leg made on

September 27, 2004. (Tr. 21). The ALJ noted that this was the first and only time Dr. Slattery

made this finding; Dr. Hughes concluded that the motor examination a month later on October

29, 2004, was normal; and Dr. Slattery failed to use the 5/5 manual muscle testing procedure,

failed to say whether the plaintiff gave a good effort, and failed to say if the weakness was in any

dermatomal distribution. (*Id.*) The ALJ discounted Dr. Slattery's findings on the additional

ground that while she found decreased lumbar range of motion, decreased sensation to light

touch on the left leg, and a "trigger point along the cervical and parathoracic spine," motor

testing was evidently normal. (*Id.*)

The ALJ gave reduced weight to Dr. Slattery's RFC assessments because although

plaintiff continued to regularly see Dr. Slattery, Dr. Slattery did not document any type of back

examination during the three years between March 4, 2005 and February 1, 2008, despite the fact

that plaintiff continued to regularly see Dr. Slattery. (*Id.*). In addition, the ALJ noted that Dr.

Slattery made a diagnosis of fibromyalgia for the first time on June 12, 2006, but there was no

documentation of any tender or trigger point examinations. (*Id.*). In any event, the ALJ noted

that Dr. Slattery found Celexa controlled the alleged fibromyalgia, as well as plaintiff's

depression and anxiety. (*Id.*).

Based on his thorough review of the medical record, the ALJ could reasonably determine

24

that Dr. Slattery's conclusion of total disability was not well-supported by the clinical and

objective findings and was inconsistent with Dr. Hughes' physical findings. Although Dr.

Hughes made some positive findings, they were of a mild nature. These findings consisted of a

"slight alteration in light touch sensation affecting the right foot"; reduced flexion ranging from

60 to 70 degrees; pain on straight leg raising at 90 degrees in October 2004; a slow gait; and an

equivocal decreased light touch sensation of the left foot in January 2005. (Tr. 20). There were

no significant neurological deficits. Plaintiff could stand on heels and toes (Tr. 134-135);

bilateral straight leg raising was frequently normal and negative straight leg raising test results

were reported by both Dr. Slattery and Dr. Hughes (Tr. 132, 134-135, 170); reflexes were intact

(Tr. 132, 134, 135); strength was normal, or slightly reduced in the lower right extremity on one

occasion (Tr. 135, 211); and there was no documented evidence of atrophy. The lack of any

significant neurological deficits and atrophy supports the ALJ's conclusion that plaintiff's claim

of severe disabling pain due to her lower back impairment is not confirmed by the objective

medical evidence. *See Crouch v. Secretary of Health & Human Services,* 909 F.2d 852, 857 (6th

Cir. 1990); *Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 231 (6th Cir.

1990) ("there was no evidence of muscle atrophy, typically associated with severe pain, . . . and

no neurological defects were shown.").

25

Finally, contrary to plaintiff's contention, the ALJ did give some weight to the state agency reviewing physicians who reviewed the record after Dr. Hughes last examined plaintiff.[2] The ALJ decided to give no weight to the RFC assessment of the state agency reviewer, Dr. Cho, for a range of light work "except as otherwise stated." (Tr. 21). The ALJ then determined that when plaintiff's credible allegations of pain are considered, the RFC is further reduced to a full range of sedentary work as follows: She can lift and carry 10 pounds occasionally and 5 pounds frequently, she has no limitation on sitting assuming normal breaks, she has no limitations on standing and/or walking two hours during work day, and "[a]ll posturals are limited to occasional." (*Id.*).

For the above reasons, the ALJ did not violate the Social Security regulations and rulings in rendering the findings he did. The ALJ gave "good reasons" for discounting Dr. Slattery's conclusion of total disability. His decision that plaintiff was not disabled but could perform a range of sedentary work is supported by substantial evidence. The ALJ's determination must stand if it is supported by substantial evidence regardless of whether this Court would resolve the conflicts in the evidence differently. *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). Plaintiff's first three assignments of error should be overruled.

---

Plaintiff also claims as part of his first assignment of error that the ALJ erred by failing to take into account the opinion of the reviewing psychologists to whom he gave the most weight when he determined the mental RFC. Plaintiff states that those psychologists found that plaintiff could have only occasional and superficial contact with the public, co-workers and supervisors (occasional meaning one-third of the work-day - *See Hensley v. Commissioner*, 573 F.3d 263, 265 (6th Cir. 2009), whereas the ALJ omitted the limitation of only occasional public contact from the hypothetical he posed to the VE. Plaintiff addresses this error again in the fifth assignment of error, "The vocational errors." Because the fifth assignment of error alleges mistakes the ALJ made at the fifth step of the disability evaluation with respect to evaluating the vocational evidence, the Court will address the claimed error concerning the mental limitations as part of that assignment of error.

**B. Fourth Assignment of Error**

Plaintiff claims that the ALJ's credibility determination is not supported by the record because plaintiff had a good work record up until 1999 when she injured her back. (Doc. 6 at 7, citing Tr. 53-54). Plaintiff asserts the only factor the ALJ considered to conclude her subjective complaints were not credible was the issue of plaintiff's allegedly undocumented testimony that she experienced very severe side effects from her medications. Plaintiff further asserts the ALJ failed to evaluate other factors under 20 C.F.R. § 404.1529 and SSR 96-7p which support plaintiff's complaints of pain, such as the objective medical findings, the fact that she has taken strong pain medication without relief (*Id.*, citing Tr. 99), and the restricted nature of her daily activities, *i.e,* the fact that she does one activity for 30 minutes and then lies down for 30 minutes and that she has help at home with household chores and grocery shopping. (*Id.,* citing Tr. 272, 273-275).

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Social Security Regulation 96-7p describes the requirements by which the ALJ must abide in rendering a credibility determination:

27

> It is not sufficient for the adjudicator to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

(emphasis added). The ALJ's credibility decision must also include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c); SSR 96-7p.

Here, the ALJ credited plaintiff's allegations of severe low back pain, but not insofar as plaintiff claimed her pain was disabling. (Tr. 21). Rather, the ALJ determined that plaintiff was "partially, but not fully, credible." (*Id.*). The ALJ found that plaintiff's allegations of pain seemed inconsistent with the "generally mild to moderate laboratory findings and clinical signs;" that plaintiff "has an unimpressive work record and no inference can be made that she would work if she could" (*Id.*); and that although plaintiff alleged very severe side effects from the medication, those are not documented in the record. (Tr. 22). To the contrary, Dr. Slattery noted on December 12, 2005, that plaintiff denied any side effects (*see* Tr. 162), and Dr. Slattery's notes showed that the alleged fibromyalgia was controlled with Celexa.

28

The ALJ's credibility determination is supported by the record and is entitled to deference. The only evidence plaintiff cites to dispute the ALJ's finding that she has an unimpressive work record is the record of her earnings (Tr. 53-54), which does not contradict the ALJ's opinion that little information concerning her motivation to work can be derived from her work history. Moreover, the ALJ properly discounted plaintiff's report of side effects on the medication form dated October 2, 2008 (*see* Tr. 123) based on inconsistent information contained in the report of Dr. Slattery. On the form, plaintiff reported that Percocet and Celexa made her lightheaded, Valium made her feel drowsy, Soma made her feel sleepy, and Lyrica caused her to have blurry vision. However, as the ALJ correctly noted, plaintiff denied any side effects from her medications in December 2005. (Tr. 162). Plaintiff argues she was on "newer and different medicines by the time of her hearing, so it would not be surprising if she was experiencing side effects from these new medicines at that time." (Doc. 6 at 5). Whether the alleged side effects would be surprising or not, the record fails to support plaintiff's argument. Plaintiff had been taking Valium and Celexa since December 2005 (*see* Tr. 209), and she was taking four of the medications as of July 18, 2006, when Dr. Slattery completed another medical questionnaire that did not note any side effects from the medications. (Tr. 169-171). Plaintiff fails to cite to any medical evidence showing the remaining "new" medication, Lyrica, caused any side effects. Finally, plaintiff does not point to evidence regarding her daily activities which demonstrates that the ALJ erred by rendering the credibility determination he made. For these reasons, plaintiff's fourth assignment of error is not well-taken and should be overruled.

### C. Fifth Assignment of Error

Plaintiff claims as her fifth assignment of error that the ALJ erred by omitting certain

limitations from the hypothetical he posed to the VE. (Doc. 6 at 9-10). Specifically, plaintiff

claims the ALJ omitted "the supported limitations of Dr. Slattery and the claimant's supported

testimony about her limitations." (*Id.* at 9). Plaintiff further claims the ALJ omitted certain

limitations found by the reviewing state agency psychologist to whom the ALJ decided to accord

the most weight (*i.e.*, Patricia Semmelman), who noted "only occasional and superficial contact

with the public, co-workers and supervisors."[3] (*Id.* at 4, 9, citing Tr. 191). Plaintiff claims that

the ALJ included in his hypothetical that plaintiff "can interact occasionally and superficially"

but omitted any limitation on public contact. (*Id.*, citing Tr. 282-283). Plaintiff claims without

citing any authority that some of the jobs the VE listed - pari-mutuel ticket taker, security

monitor, order clerk - require public contact for more than one-third of the work day and would

be eliminated if plaintiff was limited to only occasional contact with the public. (*Id.*)

Plaintiff also claims that the ALJ erred in determining the number of unskilled sedentary

jobs she could perform. In support of this argument, plaintiff cites the Sixth Circuit decision in

*Cunningham v. Commissioner*, 360 F. App'x 606, 615-616 (6th Cir. 2010) for the proposition

that the VE should consult a more recent source than the Dictionary of Occupational Titles.

(DOT). (*Id.* at 9). Plaintiff cites the O\*NET (Occupational Information Network) as an example

of one such more recent and reliable source. (*Id.*) Plaintiff has attached to his Statement of

Errors information from the O\*NET which she claims shows that the four sedentary jobs which

the ALJ found plaintiff could perform based on testimony by the VE are all above the unskilled

level. (*Id.* at 10).

The Commissioner may meet his burden at Step 5 of the sequential evaluation process of

---

Dr. Semmelman actually stated only that plaintiff could "interact occasionally and superficially . . . ."

identifying a significant number of jobs in the economy the claimant can perform through reliance on a VE's testimony in response to a hypothetical question. *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 474 (6th Cir. 2003). However, to constitute substantial evidence so as to satisfy the Commissioner's burden, the hypothetical question posed to the VE must accurately reflect the claimant's mental and physical limitations. *Ealy Comm'r of Soc. Sec.,* 594 F.3d 504, 516 (6th Cir. 2010). Where the hypothetical question posed by the ALJ fails to accurately portray the plaintiff's limitations and RFC, the ALJ errs by relying on the VE's answer to the hypothetical. *White v. Comm'r of Soc. Sec.,* 312 F. App'x 779, 789 (6th Cir. 2009).

Here, the hypothetical the ALJ posed to the VE accurately conveyed plaintiff's mental limitations as reasonably determined by the ALJ. In his decision, the ALJ stated that he placed "great weight" on the mental capacity assessment of the reviewing psychologist, Patricia Semmelman, and especially her determination that plaintiff "can interact occasionally and superficially, receive instructions, and ask questions in the workplace. She can cope with ordinary routine changes in the workplace, provided that work is not fast paced or high demand." (Tr. 21). Plaintiff has not pointed to evidence which supports a finding that her limitations are more severe than those found by the ALJ. Moreover, the ALJ included the limitations found by the reviewing psychologist in his hypothetical to the VE. In the first hypothetical he posed to the VE, the ALJ stated that plaintiff "can interact occasionally and superficially and receive instructions and ask questions appropriately in a work setting. . .", among other mental limitations. (Tr. 283). The VE responded that there would be some sedentary jobs that plaintiff could perform given these limitations, which would include protective service worker type jobs (surveillance system monitor), of which there are 100 locally and 14,000 nationally;

31

bookkeeping, accounting and auditing clerk jobs, of which there are 525 locally and 77,000 nationally; correspondence and order clerk jobs, of which there are 205 locally and 18,500 nationally; and jobs as inspectors, testers, sorters, samplers and weighers, of which there are 110 locally and 15,000 nationally. (Tr. 283-284). Plaintiff has not cited any authority to support his argument that the jobs the VE named require more than occasional public contact.

Plaintiff's claim that the ALJ erred by relying on the VE's testimony insofar as it was based on outdated information contained in the DOT should be rejected. The Sixth Circuit stated in *Cunningham* that "while the Social Security Commissioner does take administrative notice of [the DOT] when determining if jobs exist in the national economy, 20 C.F.R. § 404.1566(d)(1), common sense dictates that when such descriptions appear obsolete, a more recent source of information should be consulted." 360 F. App'x at 615. The Court found that more current job descriptions were available at the time of the hearing in that case because the Department of Labor has replaced the DOT with the O*NET. *Id.* at 616. The Court concluded that the VE's reliance on the DOT listings alone did not entitle the VE's testimony to a presumption of reliability because the particular descriptions the VE relied on were not found in the O*NET. *Id.*

Here, the same conclusion is not warranted. Plaintiff's failure to provide the O*NET information at the administrative level precludes this Court from considering it for the first time as a part of its review. A remand for further proceedings is appropriate if a claimant shows that evidence she is presenting for the first time "is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Commissioner of Social Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)). Evidence is "new" if it was not in existence or available to the claimant at the time of the administrative proceeding. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

32

Evidence is considered "material" if "there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (citations and internal quotation marks omitted). To show "good cause," the moving party must present a valid justification for the failure to have acquired and presented the evidence in the prior administrative proceeding. *Id.*

The O*NET evidence plaintiff presents is not new, and plaintiff has not offered a valid justification for failing to present it at the administrative level. Plaintiff was represented by counsel at the ALJ hearing. After the VE testified to the types of jobs plaintiff could perform based on the hypothetical posed by the ALJ and to the number of jobs existing in the local and national economy, counsel was given the opportunity to question the VE. (Tr. 286). Counsel did not ask the VE any questions so as to test the validity of the information on which the VE was relying or to allow the Court at this stage to ascertain the reliability of that information. It is not apparent from the face of the information plaintiff has supplied subsequent to the hearing that the information relied on by the VE is obsolete or that the VE's testimony is otherwise not reliable so as to warrant a remand of this case for further development of the vocational evidence.

Because the ALJ took plaintiff's physical and mental limitations into account in posing his hypothetical to the VE, and because the record does not show that the ALJ erred in relying on the VE's testimony to find that plaintiff could perform a significant number of jobs existing in the national economy, plaintiff's fifth assignment of error should be rejected. The ALJ's finding of nondisability should be upheld as supported by substantial evidence.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **AFFIRMED**.


Date:  _5/23/2011_

Karen L. Litkovitz
United States Magistrate Judge

34

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KIMBERLY BUNGER-STANLEY,               Case No. 1:10-cv-507
      Plaintiff                          Beckwith, J.
                                                Litkovitz, M.J.

      vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).